UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HALO BRANDED SOLUTIONS, INC., | ) |
| Plaintiff, | ) |
| vs. | ) 08 C 5207 |
| DONALD GOLDMAN, KENNETH S. GOLDMAN, and KENNETH S. GOLDMAN LIVING TRUST, | ) Judge Feinerman |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff HALO Branded Solutions, Inc. ("HALO") brought this action against Defendants Donald Goldman, Kenneth Goldman, and the Kenneth S. Goldman Living Trust (collectively, the "Goldmans"), alleging breach of warranty and fraudulent inducement to contract. The parties have filed cross-motions for partial summary judgment. Docs. 51, 54. At a status hearing on January 6, 2011 (Doc. 86), the court stated that HALO's motion was granted in part and denied in part, while the Goldmans' motion was denied. This memorandum opinion and order sets forth the basis for those rulings.

**Background**

In December 2007, HALO expressed an interest in purchasing the Goldmans' promotional products companies ("Goldman"). By late January 2008, the parties signed a Letter of Intent. Over the following three months, HALO conducted due diligence, reviewing financial information and conferring with the Goldmans and Paul Goldstein, Goldman's Chief Financial Officer and Controller. Immediately before the sale closed, HALO communicated with Kevin McHargue, Goldman's Vice President for Sales, and several Goldman sales managers. On April

-1-

24, 2008, the parties executed a Stock Purchase Agreement ("SPA") and closed the sale. The total sale price of $7.8 million initially was calculated by multiplying by seven Goldman's trailing twelve-month earnings before interest, taxes, depreciation, and amortization. The figure was reexamined, but did not change, after HALO's due diligence and the Goldman's provision of various representations and warranties required by the SPA.

HALO later came to believe that certain of the representations and warranties were false, and filed this action. The amended complaint (Doc. 6) has three counts. Counts I and III allege that the Goldmans provided false representations and warranties under Sections 3.7, 3.12, and 3.27 of the SPA. Count II alleges that the Goldmans fraudulently induced HALO to purchase Goldman for $7.8 million. Additional pertinent facts are set forth below.

## Discussion

Missouri law governs HALO's contract and fraudulent inducement claims.

I.  **Counts I and III: Representations and Warranties**

Counts I and III allege that the Goldmans breached the SPA by providing false representations and warranties. Under Missouri law, a contract plaintiff must prove: (1) a valid contract exists; (2) the rights and obligations of each party; (3) a breach; and (4) damages. *See Emerald Pointe, L.L.C. v. Jonak*, 202 S.W.3d 652, 664 (Mo. App. 2006); *Power Soak Sys., Inc. v. Emco Holdings, Inc.*, 482 F. Supp. 2d 1125, 1130 (W.D. Mo. 2007). The parties' cross-motions for summary judgment implicate five provisions of the SPA.

A.  **Section 3.12**

Section 3.12, which required the Goldmans to provide HALO with information concerning Goldman's "material" contracts, provides in relevant part as follows:

> Schedule 3.12 is a true, correct and complete list of all material Contracts to which the Company is party or by which any Asset is bound, including but not limited any such item that …
>
> (b) is with one or more of the Company's customers and is (i) for an amount in excess of Fifty Thousand Dollars ($50,000) or (ii) relates to the sale of products with a gross margin to the Company of less than 20% …
>
> [and] Sellers have provided Buyer with true and correct copies of all Material Contracts, including all amendments, waivers, and other modifications thereof.

HALO fully complied with Section 3.12 with one exception: it did not list or provide Goldman's written contract with Express Scripts, which called for gross margins between 10% and 13.6% (less than the 20% threshold in Section 3.12) and which was projected to yield annual sales of about $1 million (greater than the $50,000 threshold in Section 3.12). Goldman and Express Scripts entered into the contract in early 2008. While HALO was aware of the Express Scripts relationship, only after the acquisition closed did it learn of the *written* contract and receive a copy thereof.

HALO submits that the Goldmans' failure to list or turn over the Express Scripts contract indisputably breached Section 3.12. The Goldmans concede that the contract should have been listed on Schedule 3.12 and provided to HALO. They nevertheless contend that summary judgment should be denied because the omission was inadvertent; because HALO had access to financial, sales, and inventory data that would shed light on Goldman's relationship with Express Scripts; and because HALO sustained no actual damages.

The Goldmans' contentions are incorrect. First, an inadvertent breach of Section 3.12 is still a breach; nothing in the provision, or in the SPA as a whole, excuses inadvertent failures to comply with its terms. Second, even if HALO had knowledge of the Goldman-Express Scripts relationship, Goldman still was contractually obligated to list and turn over the written contract,

and its failure to do so was a breach. *See Power Soak*, 482 F. Supp. 2d at 1134 ("The key question is not whether the buyer believed in the truth of the warranted information … but whether it believed it was purchasing the seller's promise as to its truth") (internal quotation marks and citation omitted); *Interco Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 261 (Mo. App. 1976) ("All the buyers are required to establish is that the express warranties were made and that they were false, thereby establishing a breach of contract."); *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 649 (7th Cir. 2002) ("The general rule … is that a party to a contract can enforce an express warranty even if he should believe or even does believe that the mishap warranted against will occur."). Third, while there is a genuine dispute as to whether the breach caused HALO to sustain actual damages, HALO seeks summary judgment only as to breach, not as to causation or damages, a choice Rule 56 permits. *See* Fed. R. Civ. P. 56(a) (permitting summary judgment on "part" of a claim); Fed. R. Civ. P. 56(g) (court may grant summary judgment "stating any material fact … that is not genuinely in dispute and treating the fact as established in the case"); Wright, Miller & Kane, *Federal Practice and Procedure*, § 2736, at 306 (1998) ("it [is] apparent that when there is a genuine issue as to damages but not as to the ultimate liability of the nonmoving party, an interlocutory summary judgment is appropriate") (citing cases); *Int'l Paper Co. v. Androscoggin Energy LLC*, 2005 WL 2429794, at *2 (N.D. Ill. Sept. 30, 2005).

Accordingly, HALO is entitled to summary judgment on the breach element of its claim that the Goldmans violated Section 3.12 with respect to the Express Scripts contract. The amount (if any) of actual damages will be resolved at trial, though it bears mention that HALO may prevail on its Section 3.12 claim even regardless of whether it proves actual damages. *See Power Soak*, 482 F. Supp. 2d at 1132 ("even if a party fails to prove actual damages, proof of the

existence of a contract and its breach will give rise to nominal damages"); *see also Dierkes v. Blue Cross & Blue Shield of Mo.*, 991 S.W.2d 662, 669 (Mo. 1999); *Emerald Pointe*, 202 S.W.3d at 664.

**B.     Section 3.27**

Section 3.27(a) required the Goldmans to list Goldman's twenty largest customers for 2006, 2007, and 2008, and to identify any such customers that had cancelled or "otherwise terminated or materially and adversely" modified their relationship with Goldman, or that had threatened to do so. The provision states:

> Schedule 3.27(a) sets forth a complete and accurate list by aggregate dollar value of sales and gross margins made or services provided during each of the twelve (12) months ended December 31, 2006 and 2007 and the period ended April 21, 2008 to the twenty (20) largest customers of the Business and the aggregate dollar value of sales to each such customer during such period. To the knowledge of the Sellers, no such customer (i) except as set forth on Schedule 3.27(a), has canceled or otherwise terminated or materially and adversely modified, threatened to cancel or otherwise terminate or materially and adversely modify, its relationship with the Company or (ii) is threatened with bankruptcy or insolvency.

Section 8.12 defines "knowledge of the Sellers" as information known by the Goldmans or "that would have been known by such Persons if they had made reasonable inquiry of the Key Employees, Paul Goldstein and Susan Young." The term "Key Employees," in turn, is defined to include Kevin McHargue, Charlie Stevens, Tom Faulkner, Houston Hale, and Dave Drook.

At closing, the Goldmans provided HALO with three lists: Goldman's twenty largest customers from 2006; Goldman's twenty largest customers from 2007; and Goldman's twenty-seven largest customers from the first four months of 2008. Schedule 3.27 also disclosed that Goldman's relationship with its largest client, CertainTeed, "has experienced a recent decline in sales due in large part to the decline in the housing construction market." The schedule did not

expressly reference any other customer on the lists. The amended complaint alleges that the Goldmans breached their Section 3.27(a) obligations regarding certain Goldman customers. HALO seeks summary judgment with respect to Track Group, while the Goldmans seek summary judgment with respect to Track Group, CertainTeed, and Starz.

### 1. CertainTeed

In November 2007, CertainTeed transferred its "Medallion Program" from Goldman to a competitor; the program had accounted for about $300,000 in annual sales, nearly 10% of Goldman's 2007 sales to CertainTeed. CertainTeed transferred the program away from Goldman after the Goldmans credited it with $88,000 for errors in the program's administration. During due diligence, Don Goldman told HALO about the transfer, but attributed it to the fact that CertainTeed had "closed down" the program. At his deposition, Don Goldman admitted that "unsatisfactory service" contributed to the loss and that he feared CertainTeed would transfer other business away from Goldman as well. CertainTeed, in fact, had begun to closely examine its accounts with Goldman, and made threatening statements to Goldman like "Is there [a] reason why the support and response on your end has been soooo lacking? Do we need to move this site to another vendor?"

In seeking summary judgment on HALO's Section 3.27 claim concerning CertainTeed, the Goldmans contend that the only material change to the CertainTeed account—the downturn in the construction market in which CertainTeed operated—was properly disclosed in Schedule 3.27(a). They assert that there is no basis to the "rumor" that problems with the Medallion Program constituted a threat to the CertainTeed relationship, characterize the loss of Medallion Program as "immaterial," and claim that CertainTeed was "very satisfied" with their ongoing relationship. HALO responds that the Goldmans falsely attributed the loss of the Medallion

Program to CertainTeed's closing down the program and to a downturn in the construction market when, in fact, CertainTeed had transferred the program to a competitor. HALO also notes that the Goldmans failed to disclose the serious threat to the overall relationship posed by CertainTeed's profound dissatisfaction with Goldman's service.

On this record, a reasonable jury could find that CertainTeed's disappointment with Goldman's performance on the Medallion Program cast a shadow over the entire relationship, that CertainTeed's nascent relationship with the Goldman competitor could result in the siphoning of additional business, and that the overall relationship with CertainTeed was in jeopardy. The Goldmans therefore are not entitled to summary judgment on HALO's claim that they failed to comply with their Section 3.27 obligation to disclose that CertainTeed, by word and deed, had threatened to "materially and adversely" modify the relationship.

### 2. Track Group

Track Group, a top ten customer in 2006 and 2007, placed its final order from Goldman in June 2007. Thus, while Track Group appeared on the top-twenty customer lists for 2006 and 2007 provided in Schedule 3.27, it was absent from the 2008 list. The parties both seek summary judgment as to whether this disclosure complied with Section 3.27; the Goldmans say that it indisputably did, while HALO says that it indisputably did not. HALO is correct.

The Goldmans submit that because Track Group appeared on the 2006 and 2007 top-twenty lists but not on the 2008 list, the "four corners of Schedule 3.27(a) made clear that Track Group ceased to be a customer." That is incorrect. At best, the schedule showed that from January through April 2008, Track Group made less than $50,993.84 in purchases, the total sales shown for the twenty-seventh customer on the 2008 list. Schedule 3.27(a) did not disclose that

Track Group had $0 in sales during that period or, more ominously, that it had not placed an order since June 2007.

The question on summary judgment is whether this disclosure (or lack thereof) indisputably satisfied (or violated) Section 3.27(a). In the Goldmans' favor, it must be said that Section 3.27(a) does not specify the precise manner in which they were to "set forth" the loss or threatened loss of business from a top-twenty customer. But there are certain circumstances where it indisputably would not suffice to merely list the top twenty customers for 2006, 2007, and the first four months of 2008. The Goldmans have implicitly conceded the point, having supplemented the three top-twenty lists with a note (whose veracity is open to question) that "Goldman's relationship with CertainTeed has experienced a recent decline in sales due in large part to the recent downturn of the construction market." What if a large customer made sufficient purchases to top all three lists, but informed Goldman in March 2008 that it would take its business elsewhere or shut its doors come May 2008? Section 3.27 surely would require the Goldmans to note on Schedule 3.27 that the customer soon would be lost. The same is true of the situation with Track Group, for there was no way for HALO to know from the top-twenty lists alone that Track Group had made its last purchase in June 2007. The Goldmans failure of disclosure regarding Track Group indisputably breached Section 3.27.

The Goldmans retort that because HALO knew before closing that the Track Group business had been lost, their failure to expressly reiterate the point in Schedule 3.27 did not violate Section 3.27. Whether HALO had independent knowledge of Track Group's departure, however, is irrelevant to whether the Goldmans breached their express warranty obligation to "set forth" knowledge of lost business *in* Schedule 3.27(a). *See Power Soak*, 482 F. Supp. 2d at 1134; *Interco Inc.*, 533 S.W.2d at 261; *Vigortone AG Prods.*, 316 F.3d at 649. Whether the

breach caused any actual damages—and, if so, the extent of the damages—are open questions that will be resolved at trial.

        **3.**      **Starz**

Starz, a top twenty customer, placed quarterly orders from Goldman in 2006 and 2007. In 2008, Starz eliminated one of its purchasing windows—a set number of days during which purchases are made—and restricted most of its orders to three windows per year. Fred Sher, the Goldman account representative responsible for Starz, accordingly projected a 25% decrease in Starz sales for 2008, estimating he would lose almost $400,000 in sales. Kevin McHargue testified at his deposition that the change in Starz's purchasing schedule was a "significant concern." In April 2008, however, Ken Goldman gave HALO a sales projection that forecasted an increase in Fred Sher's 2008 sales over his 2007 sales. HALO did not learn the full extent of Starz's reduced purchasing schedule, or Sher's estimates, until after the closing.

In seeking summary judgment regarding on the Starz-related component of HALO's Section 3.27 claim, the Goldmans contend that Sher could not be relied upon to estimate the change (if any) in Starz's 2008 purchases, and that "informed business judgment" would have resulted in a higher estimate. They also contend that Starz's altered purchasing pattern is "simply not material," maintaining that because Starz traditionally made purchases outside the quarterly program, any loss caused by the change would be negated. This is not the stuff of summary judgment. Sher and McHargue, who were intimately familiar with Starz's purchasing trends, believed there would be a material decrease in Starz sales. The question whether Section 3.27 required the Goldmans to disclose that Starz had "materially and adversely" modified its relationship with Goldman must be resolved by the jury.

## C. Section 3.7

Section 3.7(a) warrants that the Goldmans would provide GAAP-compliant financial statements to HALO and that any forward-looking financial data would be prepared and provided in good faith:

> Schedule 3.7(a) contains (i) the reviewed balance sheets and statements of income, cash flow and changes in owners' equity of the Company as of, and for the annual periods ended, June 30, 2005 and 2006 and December 31, 2007, and (ii) the unaudited and unreviewed balance sheets and statements of income, cash flow and changes in owners' equity of the Company as of and for the three (3) month period ended March 31, 2008 … . Except as set forth on Schedule 3.7(a), each of the Financial Statements is true, complete and correct in all material respects, is consistent with the books and records of the Company … and has been prepared in accordance with GAAP consistently applied throughout the periods covered thereby. … [N]o representation is made with respect to projections, budgets or other forward-looking financial data that have been provided or made available to Buyer or its agents or representatives other than that such information was prepared and provided by the Company in good faith.

The amended complaint alleges that the financial statements provided by the Goldmans to HALO did not comply with GAAP, and their forward-looking projections regarding certain customers were not prepared or provided in good faith. The Goldmans seek summary judgment on this claim. The request is denied.

Each side has adduced expert testimony as to whether the financial statements complied with GAAP. While acknowledging that the weight of an expert's opinion ordinarily presents a jury question, the Goldmans contend that HALO's expert's findings and conclusions are so fundamentally unsound that his testimony is worthless. But the Goldmans do not move to exclude HALO's expert under Federal Rule of Evidence 702, and they failed to otherwise demonstrate—with the certainty required on summary judgment—that HALO's accounting opinion is completely without merit. *See Villalba v. Consol. Freightways Corp. of Del.*, 2000

WL 1154073, at *10 n.2 (N.D. Ill. Aug. 14, 2000) (rejecting a "cursory challenge to the reliability" of an expert's opinions). The Goldmans accordingly are not entitled to summary judgment on HALO's claim that the financial statements breached Section 3.7(a).

The same result holds for the forward-looking sales projections. The Jazz Cruise account, administered by Tom Chuchola, is illustrative. Chuchola recorded $495,617 in Jazz Cruise orders for 2007; that figure was due, at least in part, to two "one time only" events that would not recur in 2008. When asked by HALO about the decreased Jazz Cruise sales through the first part of 2008, Ken Goldman stated that Chuchola "had a personal issue"—he apparently "got married quickly and quietly after his wife secured a divorce"—that "could have been a factor" in his performance. Ken Goldman did not mention the "one time only" events Jazz Cruise held in 2007; he now claims that Chuchola did not inform the company of the exceptional nature of his 2007 sales. In an affidavit, however, Chuchola avers that he discussed his "business" with the Goldmans, that he "never withheld any information" from them, that he knew of "no reason anyone could reasonably have believed that Jazz Cruise, in 2008, was going to replace the one-time-only business from 2007," and that his marriage and divorce had "nothing to do with why [his] numbers were down." On this record, there is a genuine issue of fact regarding Ken Goldman's good faith in preparing the Jazz Cruise sales projections for 2008. A similar dispute exists regarding Goldman's forward-looking projections regarding Starz, which is addressed in Section I.B.3, *supra*.

    D.    **Section 3.17**

Section 3.17 required the Goldmans to warrant that "[a]ll taxes due and payable by [Goldman] have been timely paid in full." Nearly two years after the parties finalized the SPA, HALO received a letter from the Missouri Department of Revenue stating that Goldman had

outstanding tax liabilities of nearly $39,000. The Goldmans declined HALO's demand that they pay the tax liability. HALO asks for summary judgment on its "claim" that the Goldmans thereby breached Section 3.17.

The term "claim" is put in scare quotes because HALO's amended complaint does not reference Section 3.17 or allege any breach thereof. The Goldmans' alleged breach of Section 3.17 was not addressed in discovery, and was raised in this litigation for the first time in HALO's summary judgment motion. Because a party cannot seek summary judgment on a claim not previously raised, HALO's summary judgment motion is denied with respect to Section 3.17. *See ExxonMobil Oil Corp. v. Amex Constr. Co., Inc.*, 702 F. Supp. 2d 942, 966 (N.D. Ill. 2010) ("a plaintiff may not amend its complaint through arguments in a summary judgment brief"). The cases cited by HALO are inapposite. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 509-10 (7th Cir. 2010) (involving a typographical error in the complaint that did not obscure the plaintiff's claims); *Hartzol v. McDonald's Corp.*, 437 F. Supp. 2d 805, 812-13 (N.D. Ill. 2006) (allowing plaintiff to seek summary judgment on claims not in complaint where "the parties clearly contemplated [the] other claims during discovery").

**E.   Section 6.2(a)**

In Section 6.2(a), an indemnification clause, the Goldmans agreed,

> jointly and severally, to indemnify, defend and save [HALO] from and against any and all liabilities, obligations, deficiencies, demands, claims, Proceedings, causes of action, assessments, losses, costs, expenses, interest, fines, penalties and damages (including reasonable fees and expenses of attorneys and accounts and reasonable costs of investigation) … suffered sustained or incurred by [HALO because of] any inaccuracy in any of the representations or warranties of Seller or the Company contained in Article 3 of this Agreement … .

HALO contends that it is entitled to recover the attorney fees and expenses it incurred in seeking to prove the Goldmans' breach of Sections 3.12 concerning Express Scripts and Section 3.27 concerning Track Group.

Under Missouri law, "[i]f a contract provides for the payment of attorney's fees in the enforcement of a contract provision, the trial court must award them to the prevailing party." *White v. Marshall*, 83 S.W.3d 57, 63 (Mo. App. 2002) (citation omitted); *see also Sheppard v. East*, 192 S.W.3d 518, 523 (Mo. App. 2006). That said, both sides agreed at a status hearing on October 21, 2010, that consideration of attorney fees and costs may be postponed until trial or after trial. *See* 10/21/2010 Tr. at 13-14. Because it is unclear whether HALO sustained actual damages from the two undisputed breaches, and because it is unclear whether the jury will find that the Goldmans breached the SPA in other respects, the court declines to consider contractual attorney fees at this juncture. *See* N.D. Ill. L.R. 54.3(b); *Cont'l Bank, N.A. v. Everett*, 964 F.2d 701, 702-703 (7th Cir. 1992); *Penn, LLC v. New Edge Network, Inc.*, 2003 WL 22765048, at *4 (N.D. Ill. Nov. 20, 2003).

## II. Count II: Fraud in the Inducement

Count II alleges that the Goldmans' knowingly false representations induced HALO to enter the SAP at an inflated sales price. Missouri law requires a fraud plaintiff prove (1) that the defendant made a material representation, (2) with knowledge of its falsity, (3) with intent that the plaintiff rely on that representation, (4) that the plaintiff was ignorant of the falsity, (5) that the plaintiff justifiably relied on the representation, and (6) that the plaintiff was damaged by that representation. *See Cole v. Homier Distrib. Co., Inc.*, 599 F.3d 856, 862 (8th Cir. 2010); *Ryann Spencer Grp., Inc. v. Assurance Co. of Am.*, 275 S.W.3d 284, 287 (Mo. App. 2008). The mere breach of a promise does not constitute actionable grounds for fraud. *See Trotter's Corp. v.*

*Ringleader Rests., Inc.*, 929 S.W.2d 935, 940 (Mo. App. 1996). The Goldmans seek summary judgment on five allegedly fraudulent representations, which are addressed in turn.

### A. CertainTeed

The Goldmans contend that their representations about CertainTeed indisputably were true. The argument fails to persuade. As noted in Section I.B.1, *supra*, the record suggests that Goldman lost CertainTeed's Medallion Program business not because CertainTeed had closed sown the program or because of a downturn in the construction market, as the Goldmans said, but rather because CertainTeed transferred the program to a Goldman competitor after becoming dissatisfied with Goldman's service. Although the Goldmans maintain that the distinction between closing down and transferring the program is "not material to this case and is another diversion from the genuine issues," a reasonable jury easily could disagree.

### B. Track Group

HALO claims that the Goldmans committed fraud by concealing the loss of Track Group as a customer. The Goldmans contend that HALO has no viable fraud claim because it "undeniabl[y]" had "full knowledge of the loss of the Track Group." Under Missouri law, a plaintiff must justifiably rely on a false statement to assert a claim of fraud. *See Cole*, 599 F.3d at 862. If the undisputed evidence shows that HALO knew that Track Group was no longer a client, HALO could not demonstrate justifiable reliance, and its fraud claim regarding Track Group would fail as a matter of law.

The record indisputably shows that, three days before the sale closed, Goldman regional sales manager Charlie Stevens told HALO employee Jack Mewirter about the loss of Track Group. HALO responds that it did not believe Stevens due to its "doubts about whether Mr. Stevens might have an ulterior motive to give incorrect information to try to stop the deal going

-14-

forward." Stevens, in fact, had forced the Goldmans to pay him a bonus—something no other regional sales manager received—to gain his necessary approval for the HALO acquisition. HALO also worried that Stevens and other managers were attempting to derail the sale out of fear that they would lose their jobs. Given these concerns, HALO (according to its version of the facts, which must be accepted as true when evaluating the Goldmans' request for summary judgment) approached the Goldmans to inquire whether any clients had been lost, and the Goldmans disclosed nothing. Ken Goldman then provided sales projections indicating that Arlene Gordon, Track Group's account representative, would see increased revenue in 2008—even though Gordon's supervisor estimated that her sales would decrease by about 75%, and even though McHargue testified that most of the Goldman management team expected Gordon's billings to "plummet." A jury could conclude from this evidence that HALO appropriately discounted Stevens's statement regarding Track Group, and therefore that HALO justifiably relied on the Goldman's (alleged) misrepresentations regarding Track Group. It follows that summary judgment must be denied on this component of HALO's fraud claim.

C. **Starz**

The Starz account is discussed in Section I.B.3, *supra*. HALO maintains that the Goldmans fraudulently represented that the Starz account would lose $150,000 in sales for 2008, when Fred Sher, the account representative, had estimated a $400,000 loss. The Goldmans respond that their estimate was not knowingly false because they believed that Sher's "routine pessimism" had distorted his projection. The jury might agree with the Goldmans, but a reasonable jury could find otherwise, particularly given Kevin McHargue's testimony that Starz's altered purchasing schedule caused "significant concern," and Sher's denial that his estimate reflected any pessimism on his part.

### D. Jazz Cruise

The Jazz Cruise account is discussed in Section I.C, *supra*. The Goldmans maintain that their representations about Jazz Cruise were not fraudulent because Chuchola, the Jazz Cruise sales representative, never informed them that he expected lower sales in 2008. But Chucola averred that he "never withheld any information" from the Goldmans and that he knew of "no reason anyone could reasonably have believed that Jazz Cruise, in 2008, was going to replace the one-time-only business from 2007." Disputed issues concerning the Goldmans' knowledge preclude summary judgment on this aspect of the fraud claim.

### E. Ken Goldman's Sales Projections

HALO alleges that Ken Goldman provided it with fraudulent sales projections prior to closing. The Goldmans respond that Ken Goldman was asked "at the eleventh hour" to prepare business projections for Goldman's 2008 performance, and that the projections were "estimates" and "not presently known facts." Predictions about future business performance generally cannot be the basis of a fraud claim. *See Arnold v. Erkmann*, 934 S.W.2d 621, 627 (Mo. App. 1996). Where, however, the individual making the projections "holds himself out to have special knowledge as to the value[,] and the representing party, knowing the other party is ignorant, makes a false representation as to value intending it to be relied on," a fraud claim may lie. *Ibid*. HALO has adduced evidence that would allow a jury to find that Ken Goldman's sales projections were false—evidence tending to show that he did not account for the loss of Track Group when projecting Arlene Gordon's sales, that he did not accurately reflect Fred Sher's estimated losses for the Starz account, and that he did not adjust for the one-time-only nature of certain sales to Jazz Cruise in 2007. The question whether Ken Goldman made those (allegedly) false projections knowingly is a jury question that precludes summary judgment.

**Conclusion**

HALO's motion for partial summary judgment is granted in part—as to the Goldmans' breach of Section 3.12 concerning Express Scripts, and of Section 3.27 concerning Track Group—and is denied in all other respects. The Goldmans' motion for partial summary judgment is denied in its entirety.

March 22, 2011

_____
United States District Judge